**Francis S. SULLIVAN and Wally E. Murray, Plaintiffs,**

v.

**STANDARD CHLORINE OF DELAWARE, INC., Defendant.**

**Civ. A. No. 92–734 LON.**

United States District Court, D. Delaware.

March 7, 1994.

Beverly L. Bove of Tomar, Simonoff, Adourian & O'Brien, Wilmington, DE, for plaintiffs.

James J. Sullivan, Jr. of Pepper, Hamilton & Scheetz, Wilmington, DE (Lori B. Katz of Battle Fowler, New York City, of counsel), for defendant.

## OPINION

LONGOBARDI, Chief Judge.

### I. NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs Francis S. Sullivan and Wally E. Murray brought this suit under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et. seq. ("ADEA"), against their former employer. In their first count, Plaintiffs allege that Defendant willfully and intentionally terminated their employment and denied them available positions for which they were qualified in violation of the ADEA. [Docket Item ("D.I.") 1]. Plaintiffs' second count alleges that, by terminating their employment, Defendant breached the implied covenant of good faith and fair dealing.

Presently before the Court is Defendant's Motion for Summary Judgment. (D.I. 20). In its Motion, Defendant asserts that Plaintiffs have failed to raise a genuine issue of material fact as to whether Defendant's legitimate, stated reason for terminating them was pretextual. Defendant also contends that the second count of Plaintiffs' Complaint fails to state a claim under Delaware law.

### II. FACTS

#### A. Background

Prior to 1992, the manufacturing operations of Defendant Standard Chlorine Inc. ["Standard"] were divided into two major departments, Production and Maintenance. (D.I. 25, ¶ 5). The Production Department was divided into a Main Plant group and an Auxiliary Services group. The Maintenance Department was divided into a Labor group, an Electrical Instrumentation group, a General Maintenance group, and a Fabrication group. (D.I. 25, ¶ 6). At the time of their terminations in February 1992, Plaintiff Sullivan was the supervisor of the Auxiliary Services group, and Plaintiff Murray was the supervisor of the General Maintenance group.

At some point in 1991, the management of Standard determined that a major restructuring of the company was necessary in order to meet the company's long-term goals of improved quality and efficiency. (D.I. 25, ¶¶ 3–4). To this end, management, with the aid of a consultant, developed a new organizational structure that consisted of three interdependent departments. (D.I. 25, ¶ 7). After the new structure was devised, necessary positions within that structure were identified. Job descriptions with minimum qualifications were developed for each of the supervisory and management positions, with an emphasis on managerial and interpersonal skills. (D.I. 25, ¶ 8). Also, management decided to begin to complete written performance evaluations of its employees on a regular basis; prior to the restructuring, such evaluations had not been regularly performed. (D.I. 21, at 4).

Once the job descriptions were defined, management set out to fill the new positions. (D.I. 25, ¶ 8). Each individual considered for a position was to be evaluated against the newly created job description for that position. Management would first attempt to fill the positions with its present employees and would look outside the company only if qualified individuals could not be found within the company.

It is undisputed that the Vice President of Manufacturing at Standard, Thomas Pierson (d.o.b. 5/6/37), was an active participant in the decisions as to which employees were most qualified for the newly created positions. The process by which employees were selected to fill the available positions, however, is a subject of dispute between the parties.

Pierson avers that, in making these decisions, great emphasis was placed upon both managerial skills and technical expertise.

Candidates were evaluated with respect to their managerial skills in a subjective manner; Pierson and a few other individuals evaluated the candidates by "talking" with different managers and with hourly employees. (D.I. 21, at 7; D.I. 24, at C–26). With respect to technical expertise, candidates were evaluated objectively in terms of their number of years of education and experience. (D.I. 24, at C–26). Pierson also avers that, at the time of the restructuring, he had known both Plaintiffs for over 15 years, and he was very familiar with their work performances.[1] (D.I. 25, ¶¶ 10, 19).

Plaintiffs contend, however, that the selection process undertaken by Standard to fill the newly created positions was very questionable. (D.I. 21, at 5). In particular, Plaintiffs take issue with the way in which comparative information regarding the employees was collected and interpreted to make the termination decisions. According to Plaintiffs, although Standard maintains that Pierson received input from others beneath him before making recommendations regarding who should be terminated, Pierson did not, in fact, seek opinions from the people who worked more directly with the Plaintiffs. Instead, Pierson "inserted his own subjective beliefs as to whom he felt would be the best person for the job." (D.I. 21, at 7). Plaintiffs allege that, overall, there was essentially no objectivity in the selection process.

## B. Wally Murray

Plaintiff Murray, whose date of birth is May 25, 1945, worked for Standard for eighteen years. (D.I. 21, at 3). At the time of the restructuring, Murray held the position of General Maintenance Supervisor, which involved direct supervisory responsibility for the activities of the General Maintenance group. (D.I. 25, ¶ 10). While in that position in 1991, Murray received a 13% salary increase. (D.I. 21, at 3).

As a result of the restructuring, however, the entire Maintenance Department was eliminated. Many of Murray's previous supervisory responsibilities were assigned to the newly created positions of Preventive Maintenance Manager ("PMM") and Project Labor Supervisor ("PLS"). (D.I. 25, ¶¶ 10, 11). Each of these positions also involved additional responsibilities; for example, the PMM position included, not only supervisory responsibilities, but also significant managerial responsibilities. (D.I. 25, ¶ 10). Because of his experience in the Maintenance Department, Murray was considered for both the PMM and PLS positions. (D.I. 25, ¶ 12).

Murray was considered for the PMM position along with Arnold Dunn. (D.I. 25, ¶ 13). Although neither Murray nor Dunn fully satisfied the qualifications for the position, Pierson avers that Dunn was the stronger candidate. In particular, Dunn had demonstrated a willingness to develop his technical skills whereas Murray had not. As such, Dunn, who was 51 years old, was selected for the position of PMM. Murray does not contend that he was more qualified for the position of PMM than Dunn.

Murray was also considered for the position of PLS. (D.I. 25, ¶ 14). Some of the qualifications for this position, as identified in the job description, include: an associates degree in mechanical technology; 10 years experience in maintenance and fabrication; additional training in pressure vessel codes, American Society of Mechanical Engineers' ("ASME") Codes, and OSHA regulations; excellent communication skills; strong leadership and interpersonal skills. (D.I. 25, ¶ 14). The other candidate for the PLS position was 28–year–old Michael Smith, the former Fabrication Supervisor in the Maintenance Department. (D.I. 25, ¶ 16). Smith had begun working at Standard in 1984, and had subsequently been promoted twice at Murray's recommendations. Like Murray, Smith did not have an associates degree in mechanical technology. (D.I. 25, ¶ 17). Unlike Murray, however, Smith had taken various courses to improve his technical skills, and he was familiar with pressure vessel

---

1. Plaintiff Sullivan does not dispute that at some point during his employment at Standard, he had reported directly to Pierson, who was then the Plant Manager. (See D.I. 24, at C–6, Sullivan Dep.). Similarly, Plaintiff Murray does not dispute Pierson's statement that he was very familiar with Murray's work performance. In fact, Pierson was, at some point, Murray's direct supervisor. (See D.I. 22, at B–34).

codes, ASME/ASTM codes, and welding and fabrication procedures. Also, according to Pierson, Smith had better communication, leadership, and interpersonal skills than Murray.

Murray does not dispute that during his term as the General Maintenance Supervisor at Standard, he recommended Smith for two separate promotions. (D.I. 27, Exh. A, Murray Dep. at 111–12, 117). Similarly, Murray does not dispute that Smith was taking a computer course on his own initiative. (D.I. 27, Exh. A, at 82). Murray does not dispute the fact that he was not familiar with pressure vessels and ASME codes, nor does he dispute the fact that Smith knew more about welding than he did. (D.I. 27, Exh. A, at 74, 118). Finally, Murray does not dispute that Smith had good "people skills" and that Smith's communication skills are better than his own. (D.I. 27, Exh. A, at 112, 118). Murray contends, however, that he had more hands-on experience with equipment than did Smith, and that he was a more "fair" supervisor than Smith. Murray provides no examples as to how he was more fair than Smith.

Both Murray and Smith were evaluated against the PLS job description, and Smith was found to be the stronger candidate.[2] Smith was therefore awarded the job of PLS. Murray was terminated on February 26, 1992. Murray admits that nothing was ever said to him that led him to believe that his age had anything to do with Defendant's decision to terminate him; rather, his belief that age was a factor in his termination is "just a personal feeling." (D.I. 27, Exh. A, Murray Dep., at 154, 160). Murray also admits that he believes that he was terminated because "Mr. Pierson likes Mike Smith." (D.I. 27, Exh. A, Murray Dep., at 161).

C. *Francis Sullivan*

Plaintiff Sullivan, whose date of birth is September 2, 1948, worked for Standard for sixteen years in various capacities. He began as a Maintenance Mechanic, and he became a Shift Supervisor in the main plant in 1987. (D.I. 25, ¶ 19). On June 9, 1991, he was transferred laterally to the position of Auxiliary Services Supervisor, which involved supervisory responsibility for the wastewater treatment plant. (D.I. 1, ¶ 13; D.I. 25, ¶ 20). Sullivan's responsibilities as the Auxiliary Services Supervisor were narrower than those of a Shift Supervisor in the main plant. According to Pierson, one of the reasons that Sullivan was transferred to this position was that his lack of knowledge of the main plant production processes made him less valuable in the main plant area than other Shift Supervisors. Sullivan does not dispute this.

As a result of the restructuring, the entire Auxiliary Services area was eliminated, and Sullivan's responsibilities as Auxiliary Services Supervisor were reassigned to the newly created positions of Material Handling Manager ("MHM") and Production Operations Manager ("POM"). (D.I. 25, ¶¶ 20, 21). Each of these positions also involved additional responsibilities; for example, the position of POM involved new management responsibilities that were previously performed at the Plant Manager or Assistant Plant Manager level. Because of his prior experience, Sullivan was considered for both the MHM and the POM positions.

Sullivan was considered for the position of MHM along with Charles Tucker, who had held a position superior to Sullivan before the restructuring. (D.I. 25, ¶¶ 28, 29). Both candidates were evaluated against the MHM job description. According to Pierson, Tucker's interpersonal skills and experience were superior to those of Sullivan. (D.I. 25, ¶ 29). In addition, Pierson avers that Tucker had a higher level of competence than Sullivan and was viewed as a better supervisor by both subordinates and superiors alike. For these reasons, Tucker, whose date of birth is February 9, 1952, was selected for the position of MHM.

Sullivan does not contend that age was a factor in Defendant's decision to award the position of MHM to Tucker. Rather, Sullivan believes that Tucker was selected for the MHM position because he was Pierson's

---

2. Murray admits that the PLS position was the only new position for which he was qualified.

(D.I. 27, Exh. A, at 136).

friend. (D.I. 27, Exh. B, Sullivan Dep., at 200).

Sullivan was also considered for one of the five slots in the position of POM, along with eight other candidates, all of whose positions had been eliminated in the restructuring. (D.I. 25, ¶ 22). Some of the qualifications for this position, as identified in the job description, include: a B.S. in Chemical Engineering (but relevant experience would be considered in lieu of a degree); good supervisory and interpersonal skills; problem solving ability; planning and scheduling experience; safety; 7–10 years in the basic chemical production industry with five years minimum production experience; strong communication skills; leadership ability and computer literacy. Pierson avers that each of the nine candidates was evaluated for their strengths and weaknesses in these areas. (D.I. 25, ¶ 23).

According to Pierson, Sullivan was rated very poorly with regard to his supervisory skills. (D.I. 25, ¶ 23). Pierson avers that there had been many complaints from the hourly employees whom Sullivan supervised regarding his treatment of them. In this regard, the Director of Human Resources at Standard, Martha Wallin, avers that she was informed in December 1991 by the union's business agent that a major cause of dissatisfaction among the hourly workers was Sullivan's treatment of them. (D.I. 27, Exh. E, ¶ 3). Pierson further avers that he personally disciplined Sullivan for his autocratic style of supervision. (*See* D.I. 25, ¶ 23, Exh. G). Consistent with Pierson's evaluation, Maurizio Bianchi, who was the Plant Manager while Sullivan served as Auxiliary Services Supervisor, stated in his deposition that Sullivan had a very strong character and that he did not easily accept criticism. (D.I. 27, Exh. D, Bianchi Dep., at 47–48.). Like Pierson, Bianchi had advised Sullivan on at least one occasion to adjust his management style. (D.I. 27, Exh. B, Sullivan Dep., at 111).

Pierson also avers that, of the nine candidates for POM, Sullivan had the most limited

knowledge of main plant chemical processes and equipment. (D.I. 25, ¶ 24). Bianchi too asserts that Sullivan did not have the requisite experience in the main plant to hold the position of POM. (D.I. 27, Exh. D, Bianchi Dep., at 112). In addition, according to Pierson, Sullivan's experience in problem solving was below average, he had no experience in planning and scheduling, and he had poor communication and leadership skills.

In response to Defendant's stated reasons for his termination, Sullivan states that he does not recall whether there had been complaints from the hourly employees regarding his treatment of them. (D.I. 27, Exh. B, Sullivan Dep., at 111). Sullivan does not dispute, however, that both Pierson and Bianchi had advised him to adjust his management style. (D.I. 27, Exh. B, at 111). Similarly, Sullivan does not dispute Defendant's statement that, of the nine candidates for POM, Sullivan had the most limited knowledge of main plant processes and equipment. Sullivan does not allege that the Defendant's assessments of his problem solving ability and his interpersonal skills are inaccurate. Sullivan does contend, however, that Pierson personally disliked him. (D.I. 27, Exh. B, Sullivan Dep., at 47).

The five individuals who were given the position of POM were Chris Gannon (d.o.b. 8/18/54), Michael Trusty (d.o.b. 9/7/52), William DeSantis (d.o.b. 3/15/63), Shamsudeen Said (d.o.b. 7/24/60), and Chris Stefanadis (d.o.b. 7/26/64). (D.I. 25, ¶ 25; D.I. 26, Exh. B). Gannon, Trusty, and DeSantis had all held the position of Shift Supervisor. Gannon and Trusty had worked for Standard longer than Sullivan.[3] According to Pierson, DeSantis, who had less seniority than Sullivan, had a much greater knowledge of the main plant operations and was considered to be one of the best Shift Supervisors in the plant. (D.I. 25, ¶ 25). The other two individuals selected for POM, Said and Stefanadis, both had degrees in chemical engineering and were better problem solvers than Sullivan. (D.I. 25, ¶ 26). Two other Shift Super-

---

**3.** Plaintiffs assert that, by Defendant's statement in its brief that Gannon and Trusty had more seniority than Sullivan, Defendant raises for the first time the fact that seniority was a criterion in the employment decisions. (D.I. 21, at 5).

Plaintiffs contend that throughout the course of discovery in this litigation, Defendant had maintained that the employment decisions were based solely upon education and experience.

visors were terminated along with Sullivan.[4] (D.I. 25, ¶ 25).

Overall, according to Pierson, all five of the individuals who were selected for the position of POM had both greater knowledge of the production processes than Sullivan and better supervisory and interpersonal skills. (D.I. 25, ¶ 27). Pierson avers further that all of the employment decisions were based upon job qualifications, experience, and performance; the ages of the candidates were never discussed or considered. (D.I. 25, ¶ 30).

Sullivan contends, however, that he was more qualified for the position of POM than four of the five individuals who were selected for the position.[5] As compared to Gannon, Trusty, and DeSantis, Sullivan contends that he had more experience and management training. He also contends that he "had the supervisory skills that were necessary to run a shift the way it should be run without causing problems or unnecessary problems." (D.I. 27, Exh. B, Sullivan Dep., at 191). As compared to Stefanadis, Sullivan contends that he had more management experience and skills, supervisory experience, and a better understanding of the outlying areas. (D.I. 27, Exh. B, at 196). Sullivan also asserts that in 1987, when he was employed as a Shift Supervisor, he had received an excellent performance review by his supervisor, Bianchi. (*See* D.I. 27, Exh. B, at 31). Furthermore, Sullivan notes that Bianchi, in his deposition testimony, rated Sullivan "above average" as compared to the other supervisors. (D.I. 22, at B–29).

Sullivan was terminated on February 26, 1992. He believes that "age had a lot to do with" his termination. (D.I. 27, Exh. B, Sullivan Dep., at 216).

### III. *SUMMARY JUDGMENT STANDARD*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

> Summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While the moving party has the burden initially of identifying that evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must make a sufficient showing to establish the existence of every element necessary to its case and on which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir.1987). Credibility determinations are not the function of the judge; rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

*Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). The Court must therefore examine the elements essential to Plaintiffs' claims under the ADEA to determine whether Defendant's motion for summary judgment should be granted. Because it appears to the Court that Plaintiffs are proceeding under both a disparate treatment theory and a disparate impact theory,[6]

---

4. The two Shift Supervisors who were terminated along with Sullivan were Andrew Whitehead (d.o.b. 1/03/61) and Steven Price (d.o.b. 1/03/51). (D.I. 26, Exh. D).

5. Sullivan does not contend that he was more qualified than Shamsudeen Said. (D.I. 27, Exh. B, Sullivan Dep., at 197).

6. The allegations in Plaintiffs' Complaint appear to be based upon a disparate treatment theory. (*See* D.I. 1). In their answering brief in Opposi-

the Court will discuss the elements of each of these claims in turn.

### A. Disparate Treatment

■ A plaintiff makes out a disparate treatment claim under the ADEA by alleging that his employer has treated him less favorably than others because of his age. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 985–86, 108 S.Ct. 2777, 2783–84, 101 L.Ed.2d 827 (1988); *Massarsky v. General Motors Corp.*, 706 F.2d 111, 117 (3d Cir.), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). The essential element of such a claim is that age was a determinative factor in the Defendant employer's decision to dismiss or demote the employee. *Duffy v. Wheeling Pittsburgh Steel Corp.*, 738 F.2d 1393, 1395 (3d Cir.), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984). A plaintiff may prove this by direct evidence that the employer used age in his decision regarding the employee or, in the absence of direct evidence, a plaintiff may establish a prima facie case by proving by a preponderance of the evidence that: (1) the employee belongs to the protected class, *i.e.*, is older than forty; (2) the employee was qualified for the position from which he was dismissed; and (3) others not within the protected class were treated more favorably. *Billet v. Cigna Corp.*, 940 F.2d 812, 816 n. 3 (3d Cir.1991); *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 342 (3d Cir.1990); *Massarsky*, 706 F.2d at 118.

■ When a plaintiff establishes a prima facie case, an inference of discrimination arises. *Billet*, 940 F.2d at 816. The defendant can rebut this inference by providing a legitimate, non-discriminatory reason for the dismissal or demotion. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1980); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Billet*, 940 F.2d at 816. If the defendant is successful in articulating such a reason, then the plaintiff must prove by a preponderance of the evidence that the reasons given by the employer are a pretext for discrimination. *Billet*, 940 F.2d at 816. The plaintiff can prove pretext either directly by showing "that a discriminatory reason more likely motivated the employer" or indirectly by establishing that "the employer's proffered explanation is unworthy of credence." *Id.*; *see also Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093 (quoted in *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 897 (3d Cir.), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987)).

■ To establish pretext through indirect evidence, a plaintiff must introduce " 'evidence of inconsistencies and implausibilities in the employer's proffered reasons for discharge (which) reasonably *could* support an inference that the employer did not act for non-discriminatory reasons.' " *Sorba v. Pennsylvania Drilling Co., Inc.*, 821 F.2d 200, 203 (3d Cir.1987) (emphasis in original) (quoting *Chipollini*, 814 F.2d at 900), *cert. denied*, 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988). In other words, to defeat summary judgment, a plaintiff must "introduce 'evidence that casts doubt on his employer's contention that there was a legitimate business reason' " for discharging him. *Billet*, 940 F.2d at 825 (quoting *Healy v. New York Life Insurance Co.*, 860 F.2d 1209, 1220 (3d Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989)); *Turner*, 901 F.2d at 342. This indirect evidence must be sufficient to support a *reasonable* inference that the explanation given for the employment decisions is a pretext for discrimination. *Billet*, 940 F.2d at 816. Significantly, a given reason "cannot be proved to be a 'pretext *for discrimination* ' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993) (emphasis in original). "Merely reciting that age was the reason for the decision does not make it so." *Billet*, 940 F.2d at 816.

### B. Disparate Impact

■ With regard to disparate impact claims, a plaintiff's initial burden is heavier

---

tion to Defendant's Motion for Summary Judgment, however, Plaintiffs seem to be alleging only that they are the victims of disparate impact. (*See* D.I. 21, at 13).

than it is when disparate treatment is alleged. *Massarsky,* 706 F.2d at 120. Evidence in disparate impact cases "usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Watson,* 487 U.S. at 987, 108 S.Ct. at 2785. To establish a prima facie case of disparate impact, "the plaintiff must show that the employer's selection process results in unfavorable treatment of a disproportionate number of members of the protected group to which the plaintiff belongs." *Massarsky,* 706 F.2d at 120. To carry this burden, a plaintiff must first identify the specific employment practice that is challenged. *Watson,* 487 U.S. at 994, 108 S.Ct. at 2788. Then, the plaintiff must offer statistical evidence that demonstrates that the challenged practice has caused the exclusion of applicants for jobs because of their membership in a protected class. *Id.* Any statistical disparities "must be sufficiently substantial that they raise such an inference of causation." *Id.* at 995, 108 S.Ct. at 2789.

■ Once a plaintiff has established a prima facie case of disparate impact, the defendant must produce evidence demonstrating that its employment practices are based on legitimate business reasons. *Id.* at 998, 108 S.Ct. at 2790. The burden then shifts back to the plaintiff to " 'show that other tests or selection devices, without a similarly undesirable [discriminatory] effect, would also serve the employer's legitimate interest in efficient and trustworthy workmanship.' " *Id.* (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975)).

## IV. *DISCUSSION*

The Court's discussion is divided into two parts. First, the Court will address Plaintiffs' ADEA claims. In discussing these claims, the Court will analyze Plaintiffs' disparate treatment claims and disparate impact claims separately. The second part of the discussion will focus on Plaintiffs' state law claims.

### A. *ADEA Claims*

#### 1. *Disparate Treatment*

##### a. *Wally Murray*

■ Plaintiff Murray was 46 years old when he was terminated. Defendant does not assert that Murray was not qualified for the job he was performing at the time of his termination. One of the positions for which Murray was considered after the restructuring, the position of PLS, was filled by 28-year-old Michael Smith.[7] Based on the foregoing, the Court is satisfied that Murray has established a prima facie case of age discrimination.

■ To rebut Plaintiff's prima facie case, Defendant has articulated the following reasons for terminating Murray. Pierson avers that a restructuring of the company was necessary, and that when the position of PLS was created as part of the restructuring, Defendant developed a job description for the position. Defendant then evaluated each candidate against the qualifications specified in the job description. A comparison of Murray and Smith revealed that Smith had more familiarity with pressure vessel codes and ASME codes, and that Smith knew more about welding. Furthermore, Smith had better communication, leadership, and interpersonal skills than Murray.

■ The Court finds that Defendant has satisfied its burden of articulating legitimate, non-discriminatory reasons for Murray's termination. It is now incumbent upon Murray to demonstrate that Defendant's stated reasons for terminating him are a pretext for discrimination. Murray can prove pretext either by direct evidence,[8] or by introducing evidence of "inconsistencies and implausibilities in the employer's reasons for discharge which reasonably *could* support an inference that the employer did not act for non-discriminatory reasons." *Sorba,* 821 F.2d at 203. For example, in *Chipollini,* the plaintiff

---

7. Murray does not contend that he should have been selected for the position of PMM instead of 51–year–old Arnold Dunn. (*See* D.I. 27, Exh. A, Murray Dep. at 141).

8. Murray admits that he has no direct evidence that age was a factor in his termination. (*See* D.I. 27, Exh. A., Murray Dep., at 153–54).

proved pretext by demonstrating that: 1) a medical problem cited by the employer as a reason for plaintiff's discharge did not actually affect plaintiff's job performance; 2) plaintiff's immediate supervisors were unable to identify a single example of poor performance by him; and 3) the employer alleged that plaintiff's performance as energy warden was inadequate, when in fact the employer had never clearly asked plaintiff to perform the duties of energy warden. *Healy*, 860 F.2d at 1219 (citing *Chipollini*, 814 F.2d at 900–01).

Accordingly, to satisfy his burden here, Murray must point to evidence of implausibilities in Defendant's stated reasons for terminating him that reasonably could support an inference of discrimination. *See Billet*, 940 F.2d at 828 (without some evidence to cast doubt on employer's stated reason for terminating plaintiff, court will not interfere in otherwise valid management decision; to "require less would be to expose to litigation every management decision impacting on a protected party.").

The Court's thorough review of the pleadings in this case reveals no evidence of inconsistencies or implausibilities in Defendant's stated reasons for terminating Murray. Murray himself admits that Smith had greater familiarity with pressure vessel codes and ASME codes, which was a qualification of the PLS position. Murray also admits that Smith had better communication skills, which was also a qualification of the position. Murray's argument that he should have been selected for the position of PLS is based primarily upon his contentions that he had more hands-on experience than Smith and that he was a more "fair" supervisor than Smith. Even if his contentions are true, Murray has nonetheless failed to cast doubt upon the reasons given by Defendant for terminating him.

Murray argues, nevertheless, that a triable issue of fact exists as to the reason for his discharge because Pierson injected his subjective views into the selection process. The Third Circuit has stated, however, that "[b]arring any attempt to hide discrimination, the Company has the right to make business judgments on employee status, *particularly when the decision involves subjective factors . . .* that the Company deems essential" to certain positions. *Healy*, 860 F.2d at 1220 (emphasis added). *See also Watson*, 487 U.S. at 990, 108 S.Ct. at 2786 (an "employer's policy of leaving promotion decisions to the unchecked discretion of lower level supervisors should itself raise no inference of discriminatory conduct."); *cf. id.* at 999, 108 S.Ct. at 2791 (many jobs, such as those involving managerial responsibilities, require personal qualities that are not amenable to standardized testing). The fact that Pierson may have inserted his subjective views of the candidates' skills into the selection process does not, by itself, create a material issue of fact as to whether Murray was terminated for discriminatory reasons. *See Hazen Paper Co. v. Biggins*, —— U.S. ——, ——, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) ("Whatever the employer's decision making process, a disparate treatment claim cannot succeed unless [age] actually played a role in that process and had a determinative influence on the outcome."). Clearly, some of the qualifications for the PLS position, including leadership ability, interpersonal skills, and communication skills, necessarily involve some subjective evaluation. Moreover, Pierson avers, and Murray does not dispute, that he was very familiar with Murray's work performance at Standard. Although Murray contends that Pierson did not obtain input from individuals who were more familiar with Murray's skills and abilities than Pierson was, Murray has not adduced any evidence suggesting that these individuals who were more familiar with him disagreed with Pierson's assessment of him.[9] *Compare Chipollini*, 814 F.2d at 901 (to

---

9. In this regard, the testimony of Anthony Sinabaldi does not assist Murray. First, Sinabaldi was asked to classify Murray as above average, average or below average in his performance from 1981 to 1990. (D.I. 22, at B–30). Murray was not terminated until 1992. Second, Sinabaldi's statement itself does not cast doubt on the

reasons given for Murray's termination. Sinabaldi merely stated, "I can't say specifically about Wally [Murray], because I didn't—again, he was not a direct report. . . . I can't say versus someone else that he was better, but I found him to be performing at a satisfactory or above level." (D.I. 22, at B–30).

prove pretext, plaintiff introduced letters of recommendation written after his termination, including a letter by his immediate supervisor that described him as a person who "carried out his responsibilities with a high degree of professionalism, · expertise, and dedication."). *But see E.E.O.C. v. MCI International, Inc.,* 829 F.Supp. 1438, 1455 (D.N.J.1993) (although a positive letter of recommendation cast doubt on the employer's proffered reason for terminating plaintiff, summary judgment in favor of the employer was nevertheless appropriate because nothing in the record indicated that the employer's decision to terminate plaintiff was motivated by age). In fact, Murray has pointed to no contrary evidence whatsoever.

The Court recognizes that this case would perhaps be easier if, prior to the restructuring, Defendant had performed written evaluations of its employees on a regular basis. It does not follow, however, that merely because Defendant did not perform these evaluations, its stated reasons for terminating Murray are a pretext for discrimination. As the *Billet* Court stated:

> A decision affecting an employee in the protected class does not become a discriminatory decision merely because made in the context of a reorganization, or because a younger employee is benefitted by the decision. Rather, *the inquiry is whether the decision was motivated by the affected employee's age.* If the employer's decision was based on legitimate business concerns, *i.e.,* choosing the person the employer believes is the best person for a job, the employee's disagreement with this decision does not prove pretext.

*Billet,* 940 F.2d at 827 (citing *Healy,* 860 F.2d at 1220) (emphasis added).

Viewing the evidence of record in the light most favorable to Murray, the Court concludes that Murray has not satisfied his burden of introducing evidence to show that Defendant's stated reasons for his discharge are pretextual. Defendant has articulated non-discriminatory reasons for terminating Murray; Murray has not demonstrated any inconsistencies or implausibilities in these

reasons, nor has he cast any doubt on the reasons. Moreover, Murray has pointed to no evidence in the record that reasonably could support an inference that age was a factor in his termination.

Although the Court is not unmindful of the fact that discriminatory conduct is frequently difficult to prove, the Court is nevertheless compelled to conclude, based on the record in this case, that Murray has not raised a genuine issue of material fact as to whether the reasons given by Defendant for his termination were a pretext for discrimination. Therefore, as to Murray's claim of disparate treatment, summary judgment must be granted.

### b. *Francis Sullivan*

██ Plaintiff Sullivan was 43 years old when he was terminated. Defendant does not assert that Sullivan was not qualified for the position of Auxiliary Services Supervisor, which was the job he was performing at the time of the restructuring. One of the positions for which Sullivan was considered after the restructuring, the position of POM, was filled by younger individuals.[10] Based on the foregoing, the Court is satisfied that Sullivan has established a prima facie case of age discrimination.

██ To rebut Sullivan's prima facie case, Defendant has articulated the following reasons for terminating Sullivan. Pierson avers that a restructuring of the company was necessary, and that when the position of POM was created as part of the restructuring, Defendant developed a job description for the position. Defendant then evaluated each candidate against the qualifications specified in the job description. One of the qualifications for the POM position was good supervisory and interpersonal skills. The undisputed facts in this case reflect that, during his employment at Standard, both Pierson and Bianchi had advised Sullivan to adjust his autocratic style of management. Further, Bianchi describes Sullivan as having a strong character and as being unable to accept criticism easily. Other qualifications

---

**10.** Sullivan does not contend that age was a factor in Defendant's selection of Charles Tucker for the position of MHM. (*See* D.I. 27, Exh. B, Sullivan Dep., at 200).

of the POM position with respect to which Sullivan was found to be inferior to the other candidates included problem solving ability, planning and scheduling experience, and knowledge of the main plant.

 The Court finds that Defendant has satisfied its burden of articulating legitimate, non-discriminatory reasons for Sullivan's termination. Sullivan must now demonstrate that Defendant's stated reasons for terminating him are a pretext for discrimination, i.e., "that the reasons were false *and* that discrimination (here, on the ground of age) was the real reason." *MCI International*, 829 F.Supp. at 1449 (citing *Hicks*, —— U.S. at ——, 113 S.Ct. at 2750) (emphasis in original); *see also Sorba*, 821 F.2d at 203 (plaintiff must introduce evidence of inconsistencies in the employer's stated reasons for discharge which reasonably *could* support an inference of discrimination).

Sullivan does not dispute that: 1) he had the most limited knowledge of main plant processes and equipment of the nine candidates for POM; 2) both Pierson and Bianchi had advised him to adjust his management style; and 3) the five individuals selected for POM had better interpersonal skills than he. Sullivan contends generally, however, that he should have been selected for the position of POM because he had more management and supervisory experience than some of the other candidates. In support of his contention, Sullivan points to the deposition testimony of Plant Manager Maurizio Bianchi indicating that Bianchi rated Sullivan "above average" in comparison with the other supervisors. (D.I. 22, at B–38).

Having closely reviewed the record, the Court concludes that there is insufficient evidence to support Sullivan's claim that age was a factor in his termination. As stated earlier, the fact that Pierson may have inserted his subjective views of the candidates' skills into the selection process does not, by itself, create a material issue of fact as to whether Sullivan was terminated for discriminatory reasons. *See Hazen Paper*, —— U.S. at ——, 113 S.Ct. at 1706 ("Whatever the

employer's decision making process, a disparate treatment claim cannot succeed unless [age] actually played a role in that process and had a determinative influence on the outcome."). Clearly, some of the qualifications for the POM position necessarily involve some subjective evaluation. Moreover, Pierson avers, and Sullivan does not dispute, that he was very familiar with Sullivan's work performance at Standard.

Sullivan argues, however, that the evidence shows that one of the qualifications for the position of POM was supervisory skills. With respect to this qualification, Pierson rated Sullivan "very poorly", (D.I. 25, ¶ 23), and avers that all five of the individuals who were selected for the POM position had better supervisory skills than Sullivan. (D.I. 25, ¶ 27). On the other hand, Bianchi rated Sullivan "above average" in comparison with the other supervisors.

These inconsistent assessments of Sullivan's supervisory skills by Pierson and Bianchi do, perhaps, cast doubt upon one of Defendant's stated reasons for terminating Sullivan.[11] Even if such doubt has been cast, however, this inconsistency alone does not reasonably support an inference that Defendant's articulated reasons for terminating Sullivan are a pretext for age discrimination. *See MCI International*, 829 F.Supp. at 1450 (under the ADEA, if employer's stated reason for an employment decision is implausible, a plaintiff must show at least indirect evidence of age motivation) (citing *Hazen Paper*, —— U.S. at ——, 113 S.Ct. at 1708). Sullivan must point to evidence in the record from which a reasonable inference could be drawn that discrimination was the real reason for his termination. *See Hicks*, —— U.S. at ——, 113 S.Ct. at 2752 ("a reason cannot be proved to be a 'pretext *for discrimination* ' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.") (emphasis in original); *Billet*, 940 F.2d at 816 (indirect evidence must be sufficient to support a *reasonable* inference that employer's reasons are a pretext for discrimination); *McGough v. Bethenergy*

---

11. Other reasons offered by Defendant in support of its decision to terminate Sullivan are, however, uncontradicted; for example, Pierson

and Bianchi both aver that Sullivan lacked the necessary main plant experience to perform the position of POM.

*Mines,* 837 F.Supp. 708, 710 (W.D.Pa.1993) (plaintiff must raise a question of fact as to whether employer's pretextual reason was actually a coverup for an illegally discriminatory decision) (citing *Hicks,* —— U.S. at ——, 113 S.Ct. at 2752); *MCI International,* 829 F.Supp. at 1455 (assuming the falsity of the employer's reasons for purposes of summary judgment, a plaintiff will have to show that "those false reasons together with the *prima facie* case raise a genuine issue of material fact as to whether the defendant intentionally discriminated" against the plaintiff; "of course, [the plaintiff] may submit additional facts, if any, to support this claim.").

The only additional evidence offered by Sullivan in support of his disparate treatment claim is that he felt that Pierson personally disliked him, and that he believed that his termination was related to economic concerns. Noticeably absent from the record, however, is any evidence that would support a reasonable inference that Sullivan's *age* was a factor in his termination. In this regard, viewing the evidence of record in the light most favorable to Sullivan and drawing all reasonable inferences in his favor, the Court finds that Sullivan has failed to adduce evidence sufficient to establish an essential element of his ADEA claim that he would be required to prove at trial—that Defendant acted for discriminatory reasons in terminating him. *See Hazen Paper,* —— U.S. at ——, 113 S.Ct. at 1706 (liability in a disparate treatment case under the ADEA depends upon whether the employer's decision was actually motivated by age). Therefore, as no genuine issue of material fact exists, Defendant's motion for summary judgment on this issue must be granted.

### 2. *Disparate Impact*

Both Plaintiffs additionally allege that they are victims of disparate impact. To establish a prima facie case with respect to this claim, Plaintiffs must identify the specific employment practice that they are challenging, and then offer statistical evidence showing that the challenged practice has caused the exclusion of applicants for jobs because of their age. *Watson,* 487 U.S. at 994, 108 S.Ct. at 2788. *See Massarsky,* 706 F.2d at 120–21 (to

establish prima facie case of discriminatory impact, "plaintiff must show that the employer's selection process results in unfavorable treatment of a disproportionate number of members of the protected group to which the plaintiff belongs.").

■ In support of their disparate impact claim, Plaintiffs allege that Defendant sought to hire individuals with a certain educational level. (D.I. 21, at 22). According to Plaintiffs, Defendant's selection of such individuals had an indirect discriminatory impact on employees who had been hired before the educational requirements were implemented. (D.I. 21, at 22).

Pierson avers, however, that in filling the newly created positions, experience was considered in lieu of education. Furthermore, three of the five individuals who were selected for the position of POM (for which Sullivan was considered and for which an engineering degree is preferred) did not have an engineering degree. Similarly, the position of PMM, for which Murray was considered and for which an engineering degree is preferred, was filled by an individual who did not have this degree. None of the other positions for which Plaintiffs were considered required an engineering degree.

Plaintiffs also vaguely allege that the termination decisions may have been made "in an effort to save money by hiring and promoting younger and newer employees who were not fully vested in their pension benefits and whose period until retirement was greater than the plaintiffs." (D.I. 21, at 14). Presumably, Plaintiffs are claiming that Defendant sought to hire non-vested employees, and that this practice resulted in a disparate impact upon employees over age forty.

The evidence, however, is to the contrary. Both of the individuals who were selected for the positions for which Murray was considered were vested in the pension plan, and one of them had worked for Standard longer than Murray and was closer to retirement than Murray. Similarly, of the six individuals who were chosen for the positions for which Sullivan was considered, five were vested in the pension plan, and three had worked for Standard longer than Sullivan.

Thus, Plaintiffs' vague allegation is unsupported by the facts of record.[12]

The Court finds that Plaintiffs have failed to establish a prima facie case of disparate impact. Assuming that the selection of applicants based upon their educational level and/or the selection of non-vested employees are the specific employment practices that are challenged, Plaintiffs have nevertheless failed to satisfy the second part of their burden; they have offered no statistical evidence to demonstrate the effect of such practices on employees over the age of forty. Rather, they have demonstrated only that Defendant's employment practices adversely affected them. It is well-settled that an "adverse effect on a single employee, or even a few employees, is not sufficient to establish disparate impact." *Massarsky*, 706 F.2d at 121.

On the other hand, Defendant has offered, by affidavit of Karen Elcoate,[13] statistics regarding the ages of its present and terminated employees that tend to rebut Plaintiffs' disparate impact claim. Defendant's statistical evidence includes the following:

As of January 1, 1990, twenty of its twenty-nine supervisory/management personnel were over age 40; today, nineteen of its twenty-eight supervisory/management personnel are over age 40. (D.I. 20, at 10–11; Elcoate Aff. Exhs. A, B).

From January 1, 1990 to date, twenty-seven salaried employees have been involuntarily terminated. Of those, thirteen were over age 40, and fourteen were younger than 40. (D.I. 20, at 11; Elcoate Aff. Exh. D).

From January 1, 1990 to date, fifty-nine persons were hired into salaried positions at Standard. Thirty-two of these individuals were over 40. (D.I. 20, at 11; Elcoate Aff. Exh. C).

Among its salaried personnel, thirty-two of sixty-six employed as of January 1, 1990 were over 40. Today, thirty-seven of the sixty-eight salaried personnel are over 40. (D.I. 20, at 11; Elcoate Aff. Exhs. A, B).

According to these statistics, the percentage of supervisory/management personnel over the age of forty who were employed by Defendant remained essentially the same after the restructuring. Similarly, approximately one-half of the twenty-seven salaried employees who were terminated as a result of the restructuring were over age forty; the rest were younger than age forty. This evidence tends to support Defendant's assertion that its employment practices did not have a disparate impact on employees over the age of forty. *See Healy*, 860 F.2d at 1218.

In response to the statistical evidence proffered by Defendant, Plaintiffs point mainly to the fact that the statistics represented in the first section of Defendant's brief differ slightly from the statistics represented in the argument section of the brief. Plaintiffs contend that these discrepancies create a genuine issue of material fact.

The Court does not agree with Plaintiffs' contention. The statistics upon which Defendant relies are a part of the record in this case in the form of the sworn affidavit of Karen Elcoate. Defendant's misquoting of these statistics in the argument section of its brief, though perhaps careless, does not create a genuine issue of material fact as to whether its employment practices had a disparate impact upon protected employees. Thus, having offered no other evidence to support their claim of disparate impact, Plaintiffs have failed to establish a prima facie case. Summary judgment on this claim is, therefore, appropriate.

### B. State Law Claims

In the second count of their Complaint, Plaintiffs allege that their terminations constituted a breach of the implied covenant of good faith and fair dealing. (D.I. 1, ¶ 35). Both Plaintiffs were at-will employees.

To " 'constitute a breach of the implied covenant of good faith, the conduct of the employer must constitute "an aspect of fraud, deceit or misrepresentation." ' " *Merrill v.*

---

12. Notwithstanding the fact that Plaintiffs' allegations are lacking evidentiary support, the United States Supreme Court has recently stated that "a decision by the company to fire an older employee solely because he ... is 'close to vesting' would not constitute discriminatory treat-

ment on the basis of age." *Hazen Paper*, —— U.S. at ——, 113 S.Ct. at 1707.

13. Karen Elcoate is the Human Resources Coordinator for Standard. (D.I. 26, ¶ 1).

**182**

*Crothall–American, Inc.,* 606 A.2d 96, 101 (Del.1992) (citations omitted). An employer is, however, free "to terminate an at-will employment contract for its own legitimate business, or even highly subjective, reasons." *Id.* at 103.

In support of their allegations that their discharges were in bad faith, Murray states that he "was terminated and [he] had done a good job for twelve years, never told that [he] did anything wrong." (*See* D.I. 27, Exh. A, Murray Dep., at 163). Sullivan states that he "was told that if [he] didn't have any personnel problem . . . that [he] would have a job." (*See* D.I. 27, Exh. B, Sullivan Dep., at 236). Plaintiffs allege further that the actions of Pierson "provide evidence that Standard was far from honest and forthright in the way it carried out its termination of the plaintiffs." (D.I. 21, at 29).

The Court finds that Plaintiffs have failed to state a claim for breach of the implied covenant of good faith and fair dealing. They have not pointed to any specific examples of fraud, deceit, or misrepresentation by Defendant, nor have they adduced any evidence whatsoever that would support such an inference. As such, their vague, unsupported allegations of bad faith do not raise a genuine issue of material fact for trial, and summary judgment on this claim must therefore be granted.